**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SIMON WRECKING COMPANY, INC., | : | |
| SIMON RESOURCES, INC., and | : | |
| MID-STATE TRADING COMPANY, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | CIVIL ACTION |
| v. | : | No. 03-CV-3231 |
| | : | |
| AIU INSURANCE COMPANY, | : | |
| CONTINENTAL CASUALTY COMPANY, | : | |
| TRANSPORTATION INSURANCE COMPANY, | : | |
| and | : | |
| LIBERTY MUTUAL INSURANCE COMPANY | : | |
| | : | |
| Defendants. | : | |

January 10, 2008                                                        Anita B. Brody,  J.

**<u>MEMORANDUM AND ORDER</u>**

## I.  INTRODUCTION

Plaintiffs Simon Wrecking Company, Inc., Simon Resources, Inc., and Mid-State Trading Company (collectively referred to as "Simon") bring this suit against their insurers, Defendants Transportation Insurance Company and Continental Casualty Company (collectively referred to as "Continental").  Simon brings three counts against Continental.  Count I seeks a declaration that Continental owes a duty to defend and indemnify Simon.  Count II seeks damages for Continental's alleged breach of contract based on its failure to defend and indemnify Simon.  Count III seeks damages pursuant to Pennsylvania's bad faith statute, 42 Pa.C.S. § 8371.  Jurisdiction is appropriate pursuant to 28 U.S.C. § 1332.

Currently before me are four summary judgment motions: (1) Continental moves for

1

summary judgment on all counts; (2) Simon moves for partial summary judgment to declare as a

matter of law that Continental may not deny coverage to Simon on the basis of the pollution

exclusion; (3) Simon moves for partial summary judgment on the duty to defend; and (4) Simon

moves for partial summary judgment to strike Continental's affirmative defenses alleging that

there is no covered "occurrence" and that the property damage for which Simon is liable was

"expected or intended."

## II.  FACTUAL BACKGROUND

A. Case Chronology

Between October 1, 1974 and November 13, 1979, Simon was insured under certain

primary, excess and/or umbrella comprehensive general liability ("CGL") insurance policies sold

by Continental.   These policies form the basis for Simon's Complaint that was filed in response

to the following developments.

In November 1996, Simon received a Potentially Responsible Party Letter ("PRP letter")

from the United States Environmental Protection Agency ("EPA").  The PRP letter notified

Simon that it "may incur, or may have incurred, liability" under Section 107(a) of the

Comprehensive Environmental Response, Compensation, and Liability Act of 1980

("CERCLA"), 42 U.S.C. § 9607(a), in connection with the Malvern TCE Superfund Site.

The Malvern Site, located in East Whiteland Township, Pennsylvania, was owned and

operated by Chemclene Chemicals ("Chemclene").  Chemclene distilled and recycled used

industrial cleaning solvents, including trichloroethylene ("TCE"), at the Malvern Site.  Drums

containing residual sludge from the solvent recovery process were buried at the Malvern Site.

Groundwater contamination associated with the Malvern Site was first identified in 1980 in residential wells.  The Malvern Site was also found to have soil contamination.

The materials attached to the PRP letter included records indicating that Chemclene received drums of used industrial cleaning solvents from Simon.  The PRP letter to Simon stated: "By this letter, EPA notifies you of your potential liability with regard to this matter and encourages you to perform or to finance voluntarily those response activities that EPA determines to be necessary at the Site."

By letter dated February 12, 1997, Simon notified Continental of Simon's receipt of the PRP letter and Simon's potential liability at the Malvern Site.  The notification letter stated that it served "as formal notice of receipt" of the PRP letter and "a request for defense and coverage for claims arising from this letter."

By letter dated September 24, 1997, Continental acknowledged notice of the Malvern Site claim, requested additional information to determine its obligations, if any, and reserved its right to assert any exclusion contained in the policies.

In 1999, certain recipients of the Malvern Site PRP letter entered into a consent decree with the EPA and the Pennsylvania Department of Environmental Protection.  Under this consent decree, the settling, potentially-responsible parties were permitted to file suit against the non-settling, potentially-responsible parties, which included Simon.

By letter dated May 14, 2001, Continental reserved its rights and failed to defend or indemnify Simon.  Continental's letter "request[ed] an update regarding developments . . . since our last communication."  The letter requested more information from Simon, notified Simon of "potential bases" for the denial of coverage (including the pollution exclusion clause), and asked

3

for Simon's cooperation "in providing the information necessary to [Continental's] analysis of this claim."

By letter dated July 30, 2002, Simon notified Continental that the settling, potentially-responsible parties from the Malvern Site had initiated a lawsuit against Simon, though the complaint had not yet been formally filed.  In this letter, Simon requested that the insurance companies defend Simon in the underlying lawsuit and reimburse Simon for the legal costs incurred since 1998.  Simon also requested that Continental's "reservations or coverage decisions be re-examined" in light of the Pennsylvania Supreme Court's decision in *Sunbeam Corp. v. Liberty Mutual Ins. Co.*, 781 A.2d 1189 (Pa. 2001).

On December 9, 2002, the settling, potentially-responsible parties from the Malvern Site formally filed a complaint in this Court against the non-settling, potentially-responsible parties from the Malvern Site, including Simon as a named defendant.  *Action Mfg. Co. v. Simon Wrecking Co.*, No. 02-CV-08964 (E.D. Pa. filed Dec. 2, 2002) ("*Action Mfg.*").[1]

By letter dated February 24, 2003, Continental responded to Simon's July 30, 2002 letter requesting "further information before the request for reimbursement . . . can be meaningfully considered."   Additionally, Continental concluded that "*Sunbeam* does not hold that 'sudden and accidental' means 'unexpected and unintended.'  It merely stands for the proposition [that]

---

[1] In April 2006, after a bench trial in *Action Mfg.*, this Court found Simon Wrecking liable to Plaintiffs Chemclene Defense Group "for contribution as a transporter of hazardous waste to the Site."  *Action Mfg. Co. v. Simon Wrecking Co.*, 428 F. Supp. 2d. 288, 293 (E.D. Pa. 2006).  This Court also found "Simon Resources, but not Mid-State [T]rading liable as a successor to Simon Wrecking under the *de facto* merger exception."  *Id.*  Although Mid-State trading was not held liable as a corporate successor to Simon Wrecking, this Court found it to be wholly owned by Simon Resources.  *Id.* at 316.  This Court entered a judgment against Simon Wrecking and Simon Resources in the amount of $1,544,604, to be adjusted upon the sale of a certain property owned by Chemclene.

regulatory estoppel and custom and usage in the industry may be considered in this context."

On May 21, 2003, Simon filed the instant action for declaratory judgment, breach of contract, and bad faith against Continental.   The complaint was amended on November 5, 2003.

On March 2, 2006, the EPA filed its own CERCLA action against Simon for reimbursement of current and future costs that had been and would be incurred by the United States in response to clean up at the Malvern Site.  *United States of America v. Simon Wrecking Inc., et. al.,* 05-CV-05983 ("*EPA* suit").  This case remains active in this Court pending settlement.

By letter of March 22, 2006, Simon notified Continental of the *EPA* suit.  On February 27, 2007, Simon filed a Second Amended Complaint to include the *EPA* suit in this action.

B. The Insurance Policies

At issue in this case are the standard CGL policies created in 1970, which contain the pollution exclusion.  In order to understand the meaning of the pollution exclusion contained in these policies it is important to briefly examine preceding standard CGL policies.

The late Judge Edward R. Becker in *New Castle County v. Hartford Accident and Indemnity Co.*, 933 F.2d 1162 (3d Cir. 1991) sets forth a detailed history of the language and interpretation of standard CGL policies in existence prior to 1970.   I extrapolate this history of insurance coverage from Judge Becker's opinion.

Before 1966, the standard CGL policy covered all property damages that were "caused by accident."  *New Castle*, 933 F.2d at 1196.  The phrase "caused by accident" was not defined in these policies and many insurers argued that the term did not cover gradual damage, but instead only covered abrupt events.  *Id*.  However, the judiciary resoundingly rejected this interpretation

5

of "caused by accident" and held that these policies covered any unintended gradual injury, including damage resulting from pollution.  *Id*.

In 1966, in response to these judicial rulings, the insurance industry increased premiums to compensate for the coverage provided for gradual damage and changed the standard CGL policy to "occurrence-based" coverage.  *Id*.  The standard policy defined an occurrence as "an accident, including continuous or repeated exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured."  1966 Standard Form CGL Policy.  Thus, the standard "occurrence-based" policy explicitly covered damage caused by gradual pollution.  *Id*. at 1197.  "So long as the ultimate loss was neither expected nor intended, courts generally extended coverage to all pollution-related damage, even if it arose from the intentional discharge of pollutants.  *Id*.

In 1970, the insurance industry again changed its standard CGL policy, but this time in response to the growing awareness of the harmful environmental effects of pollution.  *Id*.  Specifically, the new standard policies included an addition to the "occurrence-based" language known as the pollution exclusion.  *Id*.  The pollution exclusion eliminated coverage for damage caused by the discharge of pollutants, unless the discharge was "sudden and accidental."  *Id*.

The insurance policies that Simon purchased from Continental contain the 1970 pollution exclusion.  It is this exclusion that is at the center of debate on whether Continental has a duty to defend and indemnify Simon.  The pollution exclusion states:

> This insurance does not apply . . . to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; *but this exclusion does not apply if such discharge, dispersal, release*

6

*or escape is sudden and accidental . . . .*

(emphasis added).

The Insurance Rating Board ("IRB") first introduced the pollution exclusion to the Pennsylvania Insurance Department on May 8, 1970, as an added endorsement to the standard-form CGL insurance.  Along with the pollution exclusion, the IRB submitted a cover letter, which stated that "[t]here is great need for prompt introduction of these exclusions in recognition of the potential and grave exposures reflected in the exclusions not previously envisioned." Additionally, the submission also contained an "explanation," which stated:

> Coverage for pollution or contamination is not provided in most cases under present policies because the damages can be said to be expected or intended and thus are excluded by the definition of occurrence.  The above exclusion clarifies the situation so as to avoid any question of intent.  Coverage is continued for pollution or contamination caused injuries when the pollution or contamination results from an accident except that no coverage will be provided under certain operations for injuries arising out of discharge or escape of oil into any body of water.

Although the parties dispute whether Continental was a full member of the IRB at the time of this filing,[2] on or about August 20, 1970, Continental made a separate filing with the Pennsylvania Insurance Department containing the exact same pollution exclusion.[3]

Both parties agree that Continental insured Simon during the time period in which the pollution occurred and that Simon's policies included the pollution exclusion.  However, the parties differ on how they interpret the pollution exclusion.  Continental asserts that the phrase

---

[2] Continental contends that in 1970 it was an associate member of the IRB for the limited purpose of boiler and machinery, nuclear energy liability and fire and property-related coverages and had nothing to do with the IRB's filing of the pollution exclusion.

[3] There is no evidence that this filing contained an explanation.  However, an internal memo, dated July 8, 1970, from Paul E. Kellenberger to Branch Managers of Continental, acknowledges the IRB filing of the pollution exclusion and the explanation that accompanied it.

"sudden and accidental" must be understood to have a temporal meaning and require an abrupt

event.  Whereas, Simon claims that "sudden and accidental" is identical in meaning to the phrase

"unexpected and unintended" and does not require any suddenness.

Simon raises three possible arguments as to why "sudden and accidental" should be

construed to mean "unexpected and unintended."   These argument are that the phrase "sudden

and accidental" (1) is ambiguous and should be construed in favor of the insured to mean

"unexpected and unintended," (2) was known in the insurance industry, prior to the filing of the

1970 pollution exclusion, to possess the same meaning as "unexpected and unintended ," and (3)

was represented by the insurance industry to the Pennsylvania Insurance Department to mean

"unexpected and unintended," and therefore regulatory estoppel prevents Continental from

asserting that the term now has a different meaning.

## III.  LEGAL STANDARD

Summary judgment should be granted under Federal Rule of Civil Procedure 56(c) "if,

after drawing all reasonable inferences from the underlying facts in the light most favorable to

the non-moving party, the court concludes that there is no genuine issue of material fact to be

resolved at trial and the moving party is entitled to judgment as a matter of law." *Kornegay v.

Cottingham*, 120 F.3d 392, 395 (3d Cir. 1997).  A factual dispute is "genuine" if the evidence

would permit a reasonable jury to find for the non-moving party.  *Anderson v. Liberty Lobby Inc.*,

477 U.S. 242, 248 (1986).  In order to survive summary judgment, a plaintiff must make a

showing "sufficient to establish the existence of [every] element essential to that party's case,

and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S.

317, 323 (1986).  The court must draw all reasonable inferences in the non-moving party's favor.

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Under the doctrine of *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938), federal courts

sitting in diversity must apply substantive law of the forum state.  Therefore, "[e]xcept in matters

governed by the Federal Constitution or by Acts of Congress, the law to be applied in any

[diversity] case is the law of the State."  *Id.*   A federal court sitting in diversity must apply the

state substantive law as set forth by the highest court in the state.  *Packard v. Provident Nat'l*

*Bank*, 994 F.2d 1039, 1046 (3d Cir. 1993).  Simon brings this case in federal court based on

diversity jurisdiction.  The pollution in question occurred in Pennsylvania.  The issues addressed

in litigation are substantive; thus, the opinions of the Pennsylvania Supreme Court must govern

my decision.[4]  Therefore, it is essential to the outcome of this case that I examine Pennsylvania

case law to determine the meaning of "sudden and accidental."


## IV.  THE LAW AFTER *SUNBEAM*

### A.  Continental's Summary Judgment Motion as to Counts I and II of the Complaint

Prior to 2001, the Pennsylvania Supreme Court had not yet examined the meaning of the

phrase "sudden and accidental."  However, the Pennsylvania Superior Court had determined that

the term "sudden and accidental" was on its face unambiguous.  *Lower Paxton Twp. v. U.S.*

*Fidelity & Guaranty Co.*, 557 A.2d 393, 399 (Pa. Super 1989) (citing *Techalloy Co., Inc. v.*

*Reliance Ins. Co.*, 487 A2d. 820 (Pa. Super 1984)).  In *Lower Paxton*, the court held that "the

pollution exclusion is not ambiguous and must be accorded its plain meaning. That meaning is

_____

[4]  Both parties agree that Pennsylvania law governs the substantive issues in this case.

9

simply that damages resulting from a pollution discharge are covered only if the discharge itself is both sudden, meaning abrupt and lasting only a short time, and accidental, meaning unexpected." *Id.*

Following this decision, the Third Circuit encountered a diversity case with a similar set of facts that required it to determine whether the term "sudden and accidental" was ambiguous. *N. Ins. Co. Of New York v. Aardvark Assocs., Inc.*, 942 F.2d 189, 190-91 (3d. Cir. 1991). Because it was a diversity case, the Third Circuit had to decide how the Pennsylvania Supreme Court would deal with the issue, even though the Pennsylvania Supreme Court had not ruled upon it. *Id.* at 192.   As a result, the Third Circuit decided to look at Pennsylvania lower court decisions because it concluded:

> Although we are not bound in a diversity case to follow decisions of a state intermediate appellate court, we are instructed that such decisions are "not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise."

*Id.* at 193 (quoting in part *West v. Am. Telephone & Telegraph Co.*, 311 U.S. 223 (1940)). Based upon the Pennsylvania Superior Court's ruling in *Lower Paxton*, the Third Circuit held that under Pennsylvania law the term "sudden and accidental" was unambiguous.  *Id.*

In *Aardvark* and *Lower Paxton*, the courts determined that "sudden and accidental" was unambiguous and required a  temporally abrupt and short-lasting event.  *Aardvark*, 942 F.2d at 193; *Lower Paxton*, 557 A.2d at 399.  These cases did not explore whether the term "sudden and accidental" possessed a special meaning in the insurance industry nor did they explore the theory of regulatory estoppel.  Rather they held that under Pennsylvania contract law "it [was] settled that where the language of [a contract] is clear and unambiguous it cannot be construed to mean

otherwise than what it says.  It must be given the plain and ordinary meaning of the terms used."
*Topkis v. Rosenzweig*, 5 A.2d 100, 101 (Pa. 1939).  The *Aardvark* and *Lower Paxton* courts
adhered to the Pennsylvania contract law principle that once a court determines a term is
unambiguous, it cannot look beyond the four corners of the document to search for an alternate
meaning to that term.  *See Id.*

      This was the state of the law in Pennsylvania regarding the interpretation of insurance
contracts until the Supreme Court of Pennsylvania decided *Sunbeam v. Liberty Mut. Ins. Co*., 781
A.2d 1189 (2001) ("*Sunbeam*").  The decision in *Sunbeam* radically altered the legal landscape
and created new avenues for insurance policy holders to challenge the interpretation of terms
within their insurance policies.

      In *Sunbeam*, the plaintiffs had standard CGL policies containing the pollution exclusion.
781 A.2d at 1191.  The plaintiffs were held liable for the costs of cleaning up environmental
pollution and sought indemnification from their insurers for these costs based upon the
contention that their pollution was covered by their insurance policies because it was "sudden
and accidental."  *Id.* at 1192.  Although the pollution resulting from the plaintiffs' actions
occurred gradually, the plaintiffs argued that it was covered by their policies because the term
"sudden and accidental" possessed the same meaning as "unexpected and unintended."  *Id.*

      To support this view, the plaintiffs argued that "sudden and accidental" should be
interpreted to mean "unexpected and unintended" because: (1) in the insurance industry the
phrase "sudden and accidental" was used in the trade to mean "unexpected and unintended," and
(2) the insurance industry had represented to the Pennsylvania Insurance Department that the
term "sudden and accidental" possessed the same meaning as "unexpected and unintended," and

11

therefore regulatory estoppel applied.  *Id.*

The *Sunbeam* litigation began before the Honorable R. Stanton Wettick of the Court of Common Pleas of Allegheny County.  In his opinion, Judge Wettick refused to accept the plaintiffs' definition of "sudden and accidental."  *Sunbeam Corp. v. Liberty Mutual Ins. Co.*, 37 Pa. D. & C.4th 44 (Pa. Com. Pl. 1997).  The opinion rejected the plaintiff's argument that trade usage altered the meaning of the term "sudden and accidental" because *Lower Paxton* had already established that the phrase was unambiguous and case law held that "a court may not refer to extrinsic evidence of the drafters' intent where the language of the clause is clear and complete." *Id*. at 56.

Judge Wettick also refused to recognize the doctrine of regulatory estoppel because, as he held, "a court should not be creating a body of law," which requires it to investigate the reasons behind the Pennsylvania Insurance Department's approval of the pollution exclusion.  *Id*.  He did not believe a court should make this determination because: (1) "the passage of time creates many obstacles," (2) "it is difficult to determine the actual reasons for a decision of a governmental body," (3) "[u]nder the separation of powers doctrine, the law places severe restrictions on the ability of one branch of government to explore the reasons why decisions were made by another branch of government," and (4) "it is not clear when the 1970 exclusion should no longer receive the interpretation which plaintiffs now propose."  *Id*. at 65-66.

The Superior Court of Pennsylvania affirmed Judge Wettick's opinion and adopted his reasoning.  *Sunbeam Corp. v. Liberty Mutual Ins. Co.*, 740 A.2d 1179 (Pa. Super. 1999). However, in *Sunbeam*, the Pennsylvania Supreme Court overturned the opinions of the lower courts.  The Pennsylvania Supreme Court held that trade usage must always be considered in

interpreting a contract, regardless of whether a phrase is ambiguous.  781 A.2d at 1193.  As

explained by the *Sunbeam* court, "[i]f words have a special meaning or usage in a particular

industry, then members of that industry are presumed to use the words in that special way,

whatever the words mean in common usage and regardless of whether there appears to be any

ambiguity."  *Id*.  According to the *Sunbeam* court, if a phrase has a trade usage then "[t]he

normal effect of a usage on a written contract is to vary its meaning from the meaning it would

otherwise have."  *Id*.

    Although the *Sunbeam* court held that trade usage must be considered, it did so

"regardless of the viability of *Lower Paxton*."  *Id*. at 1194.  The Pennsylvania Supreme Court did

not revisit the *Lower Paxton* holding that "sudden and accidental" was unambiguous.  Instead, it

formulated trade usage as a separate inquiry from the question of ambiguity.[5]  *See Id.* at 1193.

This was reiterated by the Pennsylvania Supreme Court in *Lititz Mut. Ins. Co. v. Steely*, 785 A.2d

975 (Pa. 2001), an opinion written after *Sunbeam*.  In *Lititz*, the Pennsylvania Supreme Court

stated:

> [W]here it is asserted  that the terms of a policy possess a specialized meaning in
> the insurance industry, the threshold determination is not the existence *vel non* of
> ambiguity . . . but, rather, whether the assertion of specialized meaning is correct.  If

---

[5] As stated in *Sunbeam*:

> There is no requirement that an ambiguity be shown before usage can
> be shown, and no prohibition against showing that language or
> conduct have a different meaning in the light of usage from the
> meaning they might have apart from the usage. The normal effect of
> a usage on a written contract is to vary its meaning from the meaning
> it would otherwise have.

781 A.2d at 1193 (quoting the *Restatement (Second) of Contracts § 220*, cmt. d).

it is, the terms at issue are to be given that specialized meaning, and the question of ambiguity does not arise.

785 A.2d at 982 n.12.

The Pennsylvania Supreme Court in *Sunbeam* did not overrule *Lower Paxton*. Furthermore, it reiterated in *Lititz* that ambiguity is completely independent from a determination of trade usage. Therefore, the holding in *Lower Paxton* remains valid and I dismiss the argument that the term "sudden and accidental" is on its face ambiguous.

Additionally, in *Sunbeam*, the Pennsylvania Supreme Court held that "it was error to dismiss the complaint without applying the doctrine of regulatory estoppel." *Id*. The Pennsylvania Supreme Court explained the theory of regulatory estoppel in the following manner:

> [H]aving represented to the insurance department, a regulatory agency, that the new language in the 1970 policies -"sudden and accidental"- did not involve a significant decrease in coverage from the prior language, the insurance industry will not be heard to assert the opposite position when claims are made by the insured policyholders.

*Id*. at 1192-93. After *Sunbeam*, a party could prevail based upon the theory of regulatory estoppel as long as it proved the following elements: (1) A party made a statement to a regulatory agency; (2) The regulatory agency relied upon that statement when deciding the issue presented by the party; and (3) Afterward, the party took a position opposite to the one presented to the regulatory agency.

As a result of *Sunbeam*, this Court must consider whether "sudden and accidental" has a specialized meaning in the insurance industry and whether regulatory estoppel applies. In *Sunbeam*, the Pennsylvania Supreme Court chose not to determine the issues of trade usage and regulatory estoppel. Rather, it remanded the case to the trial court to decide. 781 A.2d at 1195.

14

A definition of trade usage is necessary to determine if there is a genuine issue of material fact as to whether the phrase "sudden and accidental" possessed a specialized meaning in the trade.  According to the Supreme Court of the United States:

> The proper office of a custom or usage in trade is to ascertain and explain the meaning and intention of the parties to a contract, whether written or in parol, which could not be done without the aid of this extrinsic evidence. It does not go beyond this, and is used as a mode of interpretation on the theory that the parties knew of its existence, and contracted with reference to it.

*Barnard v. Kellogg*, 77 U.S. 383, 390 (U.S. 1870).  The Restatement (Second) of Contracts defines a "usage of trade" as "having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to [a particular agreement]."[6] Restatement (Second) of Contracts § 222(1); 13 Pa. C.S. § 1205(b).   Whether a custom or trade usage exists is ordinarily a question for the jury.  *Albus v. Toomey*, 116 A. 917, 918 (Pa. 1922). "The existence and scope of a usage of trade are to be determined as questions of fact." Restatement (Second) of Contracts § 222(2); 13 Pa. C.S. § 1205(b).

Simon contends that "sudden and accidental" was borrowed from boiler and machinery policies and that the phrase was uniformly understood to mean "unexpected and unintended." However, Simon presents virtually no evidence to support its assertion.  Simon cites case law that is not from Pennsylvania in the hope of convincing this Court that trade usage is a legal issue that has already been resolved in Simon's favor, even though Pennsylvania law and the Restatement (Second) of Contracts clearly state that trade usage is a question of fact.  Such is

---

[6]  The definition of "usage of trade" in Pennsylvania statute and the Restatement (Second) of Contracts is nearly identical.  The only difference in definition is that the Restatement (Second) of Contracts uses the above bracketed language, whereas 13 Pa. C.S. § 1205 uses the phrase "the transaction in question."

corroborated by inference from *Sunbeam* itself.[7]

Simon presents scant factual evidence. The only grounds Simon provides to support its theory that "sudden and accidental" was generally understood to mean "unexpected and unintended" is that the phrase was borrowed from boiler and machinery policies. This is found in a single quote from the deposition testimony of Richard Schmalz taken from a case in Alabama.[8] That quote from Richard Schmalz states that "the drafters of the pollution exclusion used 'language that at least some of the people in the insurance business had seen before.' Moreover, they actually looked to the 'sudden and accidental' language in boiler and machinery policies for the 'analogous concept.'" *Alabama Plating Co. v. U.S. Fidelity & Guar. Co.,* 690 So.2d 331, 336 n.8 (Ala. 1996).

Although Schmalz explains that "at least some of the people in the industry" had seen the term "sudden and accidental" before, this statement does not support the argument that the phrase had "such regularity of observance . . . to justify an expectation that it [would] be observed with respect to a particular agreement." Restatement (Second) of Contracts § 222(1). Moreover, it is questionable whether this evidence is admissible or will lead to admissible evidence. This is because: (1) Richard Schmalz was not actually deposed in *Alabama Plating*; (2) *Alabama*

---

[7] In *Morton Int'l, Inc. v. General Acc. Ins. Co. of America*, 629 A.2d 831 (N.J. 1993), decided prior to *Sunbeam*, the Supreme Court of New Jersey dealt with the identical issues of whether regulatory estoppel and trade usage applied to the phrase "sudden and accidental." Rather than remanding these issues to the trial court for a factual determination, the Supreme Court of New Jersey determined, on its own, that regulatory estoppel and trade usage were applicable. In contrast, in *Sunbeam*, the Pennsylvania Supreme Court decided to remand these issues to the trial court, which is an indication that in Pennsylvania trade usage and regulatory estoppel are factual determinations.

[8] Richard Schmalz was a key member of the drafting committee that formulated the 1970 pollution exclusion.

*Plating* found the quote in a law review article written by a former partner of Anderson Kill & Olick, P.C.;[9] (3) The law review article does not directly cite deposition testimony, but cites a motion for summary judgment styled *Boeing Co. v. Aetna Cas. & Surety Co.*, C.A. No. C86-352D (W.D. Wa.); (4) The motion for summary judgment was quoted by an earlier article in the Insurance Litigation Reporter written by partners of Anderson Kill & Olick, P.C.; (5) The summary judgment motion to which both articles cite was filed under seal and remains subject to a protective order; and (6) Only a few words of Richard Schmalz's testimony are actually quoted. These words were then pieced together, which may have distorted the intended message.

While Simon fails to produce evidence that the term "sudden and accidental" had a specialized meaning in the insurance industry and meant "unexpected and unintended," Continental submits affidavits of several insurance industry officials who represent either that the term was unclear and had no trade usage or that the term was commonly understood to require an abrupt event.   I conclude there is no genuine issue of fact as to whether the term "sudden and accidental" had a trade usage and meant "unexpected and unintended."   Therefore, I grant Continental's summary judgment motion as to Counts I and II of the complaint on the issue of trade usage.

Unlike trade usage, the parties have presented conflicting factual evidence on regulatory estoppel.  Simon presents the affidavit of Richard Schultz, an employee of the Pennsylvania Insurance Department in 1970 who alleges that the IRB represented to the department that the pollution exclusion was merely a clarification and continued to cover pollution that was "unexpected and unintended."  Also, Simon submits the explanation that accompanied the filing

---

[9] Anderson Kill & Olick, P.C. is the law firm representing Simon in this lawsuit.

of the pollution exclusion which appears to categorize the filing as a clarification of the occurrence coverage rather than a major departure from it.  Whereas, Continental submits several affidavits of employees of the Pennsylvania Insurance Department in 1970 who state that they were not misled by the filing of the pollution exclusion.

Based upon the evidence submitted by the parties, a genuine issue of material fact exists as to whether regulatory estoppel should apply.  Therefore, I deny Continental's motion for summary judgment as to Counts I and II of the complaint on the issue of regulatory estoppel and reserve the matter for trial to be determined by the factfinder.

## B. Continental's Summary Judgment Motion as to Count III of the Complaint

In Count III, Simon contends that Continental's refusal to defend and indemnify Simon constitutes bad faith in violation of 42 Pa. C.S. § 8371.  Although neither the statute nor the Pennsylvania Supreme Court has defined bad faith, the Superior Court of Pennsylvania has adopted the Black's Law Dictionary definition of bad faith:

> "Bad Faith" on the part of the insurer is any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent. For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (i.e., good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith.

*Romano v. Nationwide Mut. Fire Ins. Co.*, 646 A.2d 1228, 1232 (Pa. Super. 1994) (quoting Black's Law Dictionary 139 (6 ed. 1990)); *Terletsky v. Prudential Prop. & Casualty Ins. Co.*, 649 A.2d 680, 688 (Pa. Super. 1994).  A successful bad faith claim requires that "the insurer did not have a reasonable basis for denying benefits under the policy and that the insurer knew of or recklessly disregarded its lack of reasonable basis in denying the claim."  *MGA Ins. Co. v. Bakos*,

699 A.2d 751, 754 (Pa. Super. 1997).  While an insurance agency must have a legitimate basis

for denying a claim, "an insurer is not 'bound to submerge its own interest in order that the

insured's interests may be made paramount,' and an insurer does not act in bad faith by

investigating and litigating legitimate issues of coverage."  *Hyde Athletic Industries, Inc. v.*

*Continental Cas. Co.*, 969 F. Supp. 289, 307 (E.D. Pa. 1997) (quoting *Cowden v. Aetna Cas. &*

*Sur. Co.*, 134 A.2d 223, 228 (Pa. 1957)).

      In this case, Continental refused to defend or indemnify Simon because it believed that

the pollution exclusion applied.  Simon contends that Continental acted in bad faith in its failure

to provide coverage because *Sunbeam* created the possibility that the term "sudden and

accidental" included gradual pollution and thus Continental owed Simon coverage.  While it is

true that post-*Sunbeam* there is the potential for Simon to prevail on coverage due to the trade

usage and regulatory estoppel arguments, it has not been established that Simon will prevail.

Because this area of law is still unclear, Continental has both a reasonable basis for denying

coverage and a right to litigate this legitimate issue of coverage.   I hold that Continental has not

acted in bad faith in violation of 42 Pa.C.S. § 8371.  Therefore, I grant Continental's summary

judgment motion as to Count III of the complaint.

C.  Continental's Summary Judgment Motion as to Simon Resources, Inc. and Mid-State Trading
Company

      Continental alleges that Plaintiffs Simon Resources, Inc. and Mid-State Trading

Company have no standing to pursue the present coverage claims because under the Continental

insurance policies, neither are identified as a named insured or an additional insured.  Continental

presents little evidence to support its argument and genuine issues of material fact exist as to the

relationship between Simon Wrecking Company, Inc. and these entities. Therefore, I deny

Continental's summary judgment motion challenging the standing of Simon Resources, Inc. and

Mid-State Trading Company.

D.  Simon's Motions for Partial Summary Judgment

        Based upon my reasons for denying Continental's motion for summary judgment on the

matter or regulatory estoppel, Simon's motions for partial summary judgment are denied.[10]

---

[10] The matters raised by Simon in its motions for partial summary judgment each contain issues of genuine material fact that cannot properly be determined at this juncture.  Simon asks this Court to prevent Continental from denying coverage on the basis of the pollution exclusion; however, whether the pollution exclusion covers Simon depends on the factual determination of the applicability of trade usage and/or regulatory estoppel.  Simon also asks this Court to preclude Continental from arguing that there was no covered "occurrence" and that the pollution was "expected and intended," but these are issues of fact.  Lastly, Simon files a motion for partial summary judgment on the duty to defend.  Under Pennsylvania law, "[a] court's first step in a declaratory judgment action concerning insurance coverage is to determine the scope of the policy's coverage." *General Accident Ins. Co. of America v. Allen*, 692 A.2d 1089, 1095 (Pa. 1997).  "[T]he inquiry into coverage is independent of and antecedent to the question of the duty to defend." *Lucker Mfg. v. Home Ins. Co.*, 23 F.3d 808, 813-14 (3d Cir. 1994).  After determining the scope of the coverage, the court must then examine the complaint to ascertain whether it triggers coverage and thus the duty to defend.  *General Accident*, 692 A.2d at 1095. Because the issue in this case is the scope of coverage and the duty to defend can only be determined after the scope of coverage is defined, whether Continental had a duty to defend cannot be determined at this stage.

## ORDER

**AND NOW** on this _10th___day of ____January_____, 2008, it is **ORDERED**:

- Motion for Summary Judgment of Defendants Continental Casualty Company and Transportation Insurance Company (doc. #183) is:

  - **DENIED** as to Count I (declaratory judgment that Continental owes a duty to defend and indemnify Simon) and Count II (breach of contract) on the issues of:
    - regulatory estoppel
    - standing for Simon Resources, Inc. and Mid-State Trading Company

  - **GRANTED** as to Count I and Count II on the issues of:
    - ambiguity of the phrase "sudden and accidental"
    - trade usage of the phrase "sudden and accidental"

  - **GRANTED** as to Count III (bad faith)

- Plaintiffs Simon Policyholders' Motion for Partial Summary Judgment Striking CNA's Affirmative Defenses Alleging that There is No Covered "Occurrence" and that the Property Damage for which Simon is Liable was "Expected or Intended" (doc. #184) is **DENIED**.

- Plaintiffs Simon Policyholders' Motion for Partial Summary Judgment Regarding the "Sudden and Accidental" Pollution Exclusion (doc. #186) is **DENIED**.

- Plaintiffs' Renewed Motion for Partial Summary Judgment on the Duty to Defend (doc. #210) is **DENIED**.

- All pretrial motions and submissions are due on or before February 15, 2008.

- A final pre-trial conference is scheduled for March 14, 2008 at 4:00 p.m.

- Trial shall begin on March 24, 2008.

s/Anita B. Brody

_____

ANITA B. BRODY, J.

Copies **VIA ECF** on _____ to:          Copies **MAILED** on _____ to:

O:\ABB 2008\Simon Wrecking Summary Judgment.wpd